# EXHIBIT A

**Atlas Air/IBT**

**System Board of Adjustment**

In the Matter of the Arbitration

Between

International Brotherhood of Teamsters
Airline Division, and Teamsters Local Union No. 1224

- and -

Atlas Air, Inc.

(Management Grievance alleging Union's violation of
CBA's Section 1.F 2.b (iii)

**OPINION
OF THE
CHAIRMAN**

## The System Board of Adjustment

George Nicolau. Chairman
Daniel Katz, Union Member
Jennifer Chernichaw, Company Member

**Appearances:**

**For the Company:**

O'Melveny & Myers, LLP
  By: Robert Siegal, Esq.
       Rachel S. Janger, Esq.
       Charles J. Mahoney, Esq.

**For the Union:**

Edward Gleason, Esq.
Spivak Lipton, LLP
   By: Gillian Costello, Esq

On January 19th, 2016, Atlas Air Worldwide Holdings, Inc. (AAWW), the parent Company of Atlas Air, Inc. (Atlas) and the majority shareholder of Polar Air Cargo Worldwide, Inc. (Polar), announced its agreement to acquire Southern Air Holdings, Inc. (SAHI), the parent company of Worldwide Air Logistics Group, which, in turn, owned two subsidiaries, Southern Air, Inc. (Southern) and Florida West International Airways (Florida West). It indicated that the agreement was subject to the approval of the DOT and would occur in a few months. Immediately prior to this press release, Atlas advised the International Brotherhood of Teamsters (IBT or Union), that represented pilots at Atlas, Polar, and Southern. In those phone calls, it advised the IBT, and subsequently the

FAA and the NMB, that, following the closing, the carrier's operations and seniority lists would be in agreement.

Two days later, the Union issued a press release endorsing the merger (CX36). Though it welcomed a merger of Atlas and Southern, the Union's press release indicated that negotiations should proceed pursuant to Section 6 of the RLA. Atlas and the Union had been reaching TAs for a new Atlas agreement prior to the acquisition, but once there was an acquisition the Atlas Collective Bargaining Agreement (CBA) provided for a process to integrate seniority lists and negotiate a Joint CBA, with interest arbitration if unresolved issues remained after a 9-month negotiation period. Following the announcement, the Company turned to that procedure, even footnoting post-acquisition proposals for TAs that they were subject to the CBA's procedure. However, the Union resisted, contending that the CBA did not require that it do so. To that end, on February 24th, 2016, it sent a Section 6 notice to Atlas and Southern (CX37)

This led to an exchange of letters in which the positions had not changed and the April 4th, 2016 filing of the Company's grievance at both Atlas and Southern.[1] In this proceeding, the Union took the position that the CBA's triggers had not occurred and that there was therefore no requirement to move forward. In fact, the Union said, doing so would violate the Scope clause. First, it contended that AAWW, the acquirer of Southern, was not a party to the CBA and that, as a consequence, the acquisition trigger had not occurred. Second, it contended that, a second trigger, a complete merger, was not contemplated in that Polar would remain with its separate Single Operating Certificate (SOC). The Company recognizes that AAWW, not Atlas, purchased Southern. However, its view is that a portion of the CBA (1.F.2) is a proper path. It also argues that a complete merger of Atlas and Southern will take place and is, in fact, underway. As to the Union's claim that the grievance seeks to improperly give the System Board jurisdiction over statutory issues, the Company contends that the CBA's procedures must be given priority.

_____

[1] The Southern grievance led to a separate proceeding before Arbitrator Rich Bloch that was heard some two weeks prior to the hearing in this case.

The Board held a hearing on October 24th, 25th, and 26th, 2018, at which both Parties had full opportunity to offer evidence and argument and to present, examine and cross-examine witnesses. The Company's witnesses were John Dietrich, President and Chief Operating Officer (COO) of Atlas, Executive Vice President and COO of AAWW and Executive Vice President and Chief Operating Officer of Polar; Jim Cato, who, prior to his retirement, was Vice President of Labor Relations and Flight Operations of both Atlas and Polar; and Jerrold Glass, President of F&H Solutions Group; the Union's witnesses were First Officer Mark South, whose testimony in the Southern case was also accepted in evidence (JX6), and Captain Daniel Wells, a longtime employee of Atlas and Polar, who had held a number of pilot management positions at Polar and is now President and Principal Officer of IBT Local No. 1224.

During the hearing, counsel submitted a total of 174 exhibits and, on March 1st, 2019, filed 80+ page briefs, at which point the Record was closed.

**The Issue**

The Parties could not agree on the issue and the Company's statement of the issue and requested relief is as follows:

1. Has the Union violated Section 1.F.2.b(iii) of the parties' collective bargaining agreement by refusing to engage in negotiations, and, if necessary, interest arbitration, for a joint collective bargaining agreement?

2. Has the Union violated Section 1.F.2.a and/or the covenant of good faith and fair dealing by failing to present an integrated seniority list to the Company?

The requested remedy is an order that the Union comply with the merger provisions of Section 1.F.2.a and Section1.F.2.b(iii) of the parties' collective bargaining agreement, including that the Union:

(1) shall initiate the merger process by promptly preparing and presenting to the Company an integrated seniority list covering Southern and Atlas pilots; and

(2) shall "begin negotiations to merge the two pre-integration collective bargaining agreements into one agreement," and if a merged agreement has not been executed within nine (9) months from the date that the Union presents to the Company a merged seniority list," the Union shall "submit the outstanding issues to binding interest arbitration."

The Union's submission is:

1. Has the procedure for negotiating a joint collective bargaining agreement pursuant to Section 1.F.2.b(iii) been triggered under the 2011 Atlas Polar CBA?

3

**The Language of the CBA**

The relevant provisions are:

## SECTION 1: RECOGNITION, SCOPE, SUCCESSORSHIP AND LABOR PROTECTIVE PROVISIONS

1. In accordance with the National Mediation Board's certification in Case No. R- 7174, issued on December 22, 2008, Atlas Air, Inc. and Polar Air Cargo Worldwide, Inc. (a single Air Carrier collectively referred to as the "Company") recognizes the International Brotherhood of Teamsters, Airline Division as the collective bargaining representative of the flight deck crewmembers employed by the Company.

2. This Collective Bargaining Agreement and any formal Letters of Agreement between the Company and the Union may be collectively referred to as the "Agreement."

### B. Scope

1. Except as may be provided otherwise in this Section or elsewhere in this Agreement or Letter of Agreement between the parties all present or future flying that is performed by the Company, including flying performed by a Related Entity (as defined below), and whether or not the crewmembers doing such flying are based outside the United States, shall be performed by Crewmembers on the Atlas Air, Inc. Pilot or flight Engineer seniority lists in accordance with the terms and conditions of this agreement or any other applicable agreement between the Company and the Union.

### 3. Definitions

a. The term "Related Entity" shall mean any air carrier that is: (a) wholly or majority owned (i.e., fifty percent (50%) or more of the equity) by the Company and (b) that is effectively controlled by the Company.

b. The term "flying" as used in this Section shall mean all revenue and non - revenue flying conducted on the Company's or a Related Entity's aircraft, including wet leases for other carriers or entities, or contracting for other carriers or entities (government, military or commercial), but shall not include flying of Company or a Related Entity's aircraft conducted by other entities pursuant to a dry lease.

c. A "dry lease" shall refer to a situation wherein the Company or Related Entity does not provide Crewmembers to fly the aircraft that it has leased to another entity.

d. The term "effective control" shall mean that the Company or a Related Entity has the decisive right, privilege, or authority – by contract or otherwise – to direct, manage, or direct the management of all or a substantial portion of the air carrier joint venture or similar business arrangement.

## C. Affiliated Carriers

Should the Company elect to directly or indirectly sell, lease, or otherwise transfer any aircraft in its control to any airline that is owned controlled, or operated by the Company or Atlas Air World Wide Holdings, Inc. and such transfer would directly cause a reduction in force of the Crewmembers covered by this Agreement, the Company shall exercise reasonable efforts to obtain the agreement of the receiving airline to allow the flying of such aircraft to be performed by Crewmembers on the Atlas Air seniority list in accordance with the terms of this Agreement.

## F. Labor Protections

1. In the event the Company is acquired and thereafter the acquirer decides there will be a complete operational merger between (i) the Company and the acquirer, or the Company and another air carrier under the control of the acquirer, or (ii) if the acquirer notifies the Union of its intent to integrate the Crewmember seniority lists of the Company and the acquirer, or the Company and another air carrier under the control of the acquirer, the following shall apply:

   a. If the Union represents the Crewmembers of the successor then the Union's Merger Policy shall be utilized to integrate the two seniority lists.

   c. The integrated list, including any restrictions or conditions attached thereto, shall not impose any retroactive monetary liability on the part of either pre-merger carrier, nor shall such integrated list require any upgrade or transition training of any crewmember from either carrier.

2. In the event (i) the Company acquires another air carrier and the Company decides there will be a complete operational merger between the Company and such other air carrier, or if the Company notifies the Union of its intent to integrate the Crewmember seniority lists of the respective carriers, or (ii) in the event the Company decides there will be a complete operational merger between the Company and an affiliated air carrier, or if the Company notifies the Union of its intent to integrate the Crewmember seniority lists of the Company and an affiliated air carrier, the following shall apply:

   a. Seniority List Integration:

      i. If the Union represents the Crewmembers of the carrier to be merged with the Company then the Union's Merger Policy shall be utilized to integrate the two seniority lists.

   b. Collective Bargaining Agreements

      iii. If the crewmembers of the acquired carrier are represented by the Union, then the parties shall on a timely basis begin negotiations to merge the two pre-integration collective bargaining agreements into one agreement. If a merged agreement has not been executed within nine (9) months from

> the date that the Union presents to the Company a merged seniority list that complies with the provisions of this paragraph F.2, the parties shall jointly submit the outstanding issues to binding interest arbitration, The interest arbitration shall commence within thirty (30) days from the conclusion of negotiations contemplated by this paragraph, and a final decision shall be issued within sixty (60) days after the commencement of the arbitration.

3. For the purposes of this paragraph F, "complete operational merger" shall mean the combination of all or substantially all of the assets of the two carriers.

4. Notwithstanding anything in this paragraph F to the contrary, in the absence of a complete operational merger as determined by the Company, neither the Company nor any successor shall be under any obligation to integrate the two work forces, and either may operate both workforces independently pursuant to their respective pre-existing collective bargaining agreements (if any).

## H. Expedited Adjustment Board Procedures

1. Any grievance filed by the Company or Union alleging a violation of Section 1 shall bypass the initial steps of the grievance process and shall be submitted, heard, and resolved through binding arbitration on an expedited basis directly before the Atlas Crewmembers' System Board of Adjustment sitting with a neutral arbitrator. The dispute shall be heard as soon as possible after submission to the System Board and decided no later than thirty (30) days after the close of the hearing, unless the parties agree otherwise in writing.

2. The neutral arbitrator shall be selected by the parties by mutual agreement, or by an alternate strike method, if necessary, from a standing panel of seven (7) arbitrators, each of whom shall belong to the National Academy of Arbitrators and be experienced in disputes arising under the Air Carrier collective bargaining agreement The panel will be designated before this Agreement becomes effective.

## The Background

Since Polar was acquired in 2001, the Parties have not had a particularly good relationship. It is not necessary to set down every detail of that relationship over the years; the Parties know them well. Some key events and facts should be sufficient to explain their present position.

At the time of Polar's acquisition in 2001, the pilots at both Atlas and Polar were represented by the Air Line Pilots Association ("ALPA"). This continued until the IBT took over the representation in 2008. According to the Union's brief, the Company's

acquisition of Polar lead to a decade of turbulence and conflict between the two pilot groups as the Company played one against the other.

In mid-2004, Atlas and Polar entered bankruptcy, emerging some six months later. Near the end of that year, AAWW decided that Atlas and Polar should merge, notifying Federal authorities and advising the two pilot groups that the process of integrating the seniority lists and negotiating a JCBA should begin. The Atlas pilots then filed a Section 6 notice with the NMB; the Company objecting that the contractual merging process had already begun. By mid-2005 the Atlas pilots had agreed. The Polar pilots had not. Unlike the Atlas/ALPA CBA, the Polar/ALPA CBA was two years beyond its amendable date, with the parties already in Section 6 negotiations for some 18 months.

Though the Polar pilots continued in those negotiations, they shortly decided they were going nowhere and asked to be released. After the NMB's release and a 30-day cooling off period, they went on strike. The strike did not last long and in an agreement on October 2nd, 2015, the Polar pilots agreed to participate in the contractual negotiating process, and agreed to begin by participating in the integration of the Atlas and Polar seniority lists, completion of which and turning over to the Company would initiate the 9- month negotiation period. The integration, that did not begin until March 2006, was completed in November 2006 by an Arbitration Award of Arbitrator Robert Harris.

While this was going on and the assets of the two carriers were continuing to be merged, AAWW was exploring possible transactions that might lead the carriers to fly under Separate Operating Certificates. In fact, in May 2006, it advised the FAA that it intended to operate under two Certificates. Though it also advised that it would continue to merge operations and train pilots pursuant to a protocol that would permit them to fly in and operate aircraft owned by either Company operating under two separate certificates, this is described by the Union as a "derailment" of the merger.

Later, in 2007, AAWW sold to DHL 49% of Polar stock, with a 25% voting interest. Following the DHL Transaction, Atlas and Polar proposed a Merger Protocol Agreement. It was not signed by Alpha due to objections over the DHL Transaction and objections from Polar pilots. In 2008, IBT replaced ALPA. In February 2009, Atlas,

Polar the Union voluntarily entered into a stand-alone Negotiation Framework Agreement for a Merged Collective Bargaining Agreement in order to obtain a mutually desired joint collective bargaining agreement covering both the Atlas and Polar pilots. This eventually led to an interest arbitration. And on September 3rd, 2011 ("the Kasher Award") was issued. Subsequent to the Award there have been periods of negotiations under Section 6.

Pursuant to Section 34 of the 2011 Atlas-Polar CBA, effective on September 8th, 2011, the contract would become amendable in September 2016, but subject to reopener negotiations under RLA Section 6 "no more than two hundred and seventy (270) days prior to" the amendable date. Representatives from the Union, Atlas, Polar and AAWW thereafter met in Miami on December 11th, 2015. At a subsequent meeting on December 17th, 2015, the Union, Atlas and Polar scheduled negotiations for three days in January 2016, three days in February 2016, and three days in March, 2016. The bargaining parties first met to negotiate on January 19th, 2016, and achieved three tentative agreements during their January negotiations.

## The Positions of the Parties

The Union's position is that at no time relevant to these proceedings has the Union been required to engage in the contractual merger process that Atlas claims have been triggered. The Union's interpretation of the language of the 2011 Atlas-Polar CBA, in its entirety, and specifically to the sections referenced by Atlas testimony, 1.F.2.A and 1.F.2.B. is not a trigger because the "Company" did not acquire Southern's parent company SAHI. Simply, the Union is not bound by these sections of the CBA because the purchaser, AAWW, is not a party to the CBA.

Further the Union maintains that all announcements and communications with the Union since the announcement have come from AAWW , not the Company, and as such also have not triggered any sections of the CBA. Starting from the acquisition announcement, the intent to merge operations, and the request for an Integrated Seniority List (ISL), the Union maintains that not a single communication concerning the ISL or the intent to merge operation of Southern and Atlas has come from Atlas.

The Union also maintains that Southern is not an affiliated air carrier, as Section

1.C, in the Union's interpretation, only allows for an affiliated carrier to be a minority owned entity by the Company. This would not meet the criteria of Section 1.F.2.(ii).

The Union also asserts that even if "Atlas", rather than AAWW, had notified the Union of its intent to merge the Atlas and Southern seniority lists, the 2011 Atlas-Polar CBA does not give only one-half of the "Company", in this case, Atlas, the right to act without the consent of the other half, in this case, Polar. There is no evidence that Polar has consented to or even participated in any of the decisions and actions that have been made and are being taken to completely operationally merge Atlas (but not Polar) with Southern. As a result, even if Atlas had indeed so notified the Union (and it did not), notification by one but not both of the carriers that constitute the "Company" under the 2011 Atlas-Polar CBA is of no force and effect.

Further, the Union maintains there has been no operational merger between the Airlines and they further assert that Atlas abandoned Section 6 negotiations inappropriately as the Union's interpretation of 1.F.2.b.(iii) does not allow for a triggering event. Simply, the Union maintains that, "Atlas's single-minded pursuit of a negotiations process culminating in an interest arbitration is a function of its fear of facing its pilots and actually having to negotiate with the Union on the level playing field that the RLA is designed to secure." The Union requests that Atlas's grievance be denied.

The Company maintains that 1.F.2.b.(iii) Merger Procedures have been triggered. They agree that the AAWW was the purchaser of SAHI. However, they do not agree that Atlas must be the purchaser of Southern in order to trigger the Merger Process. They maintain that the language in Section 1.F.2.(ii) allows for the Company to 1) decide it will merge operations with an "affiliated air carrier," or 2) has given notice of an intent to integrate seniority lists of the Company and an "affiliated air carrier." If either of these events occur than the Company maintains the trigger in Section 1.F.2.b.(iii) are triggered.

The Company maintains the language in Section 1.C of the CBA as it concerns the term "affiliated air carrier" is clear, and means any airline owned or controlled by the Company or AAWW. The Company asserts that plain and ordinary reading of the meaning of "affiliated air carrier" is the test, and when the parties agreed to the Atlas-IBT CBA in 2002, the word "affiliate" had a well-established meaning in corporate law:

"a company effectively controlled by another or **associated with others under common ownership or control.**" Lastly, the Company asserts the parties' bargaining history clearly shows the term "affiliated air carrier" was meant to cover a merger between the Company and another carrier that was owned by the same corporate parent, and Section 1.F.2.(ii) was added after the Atlas pilots' negotiating committee specifically asked for language that would cover an integration of two carriers both owned by AAWW, such as an integration of Atlas and Polar, which had recently been acquired by AAWW.

The Company maintains they have repeatedly told the Union that the Company decided there would be a complete operational merger with Southern and that the Company intended to integrate the carriers' crewmember seniority lists. On February 4th, 2016, and on March 15th it passed a Transition Agreement to the Union informing it, "Atlas Air has decided there will be a complete operational merger," and "and has notified the Union of its intent to integrate the crewmember list of the two carriers." (Tr. 193:16-18; Co. Ex. 18.)

The Company asserts the evidence clearly shows that a complete operational merger between the Company and Southern has been implemented. The Atlas CBA states that "[f]or the purposes of this paragraph F, 'complete operational merger' shall mean the combination of all or substantially all of the assets of the two carriers." Here, shortly after the Southern transaction closed on April 7th, 2016, ownership of all of Southern's operating physical assets were transferred from Southern to Atlas. (Tr. 293:24-294:14.) And, as of June 30th, 2018, Atlas, Polar and Southern had already combined their total assets of $3,589.6 million, such that Atlas held $3,341.2 million, while Polar held only
$134.8 million and Southern held only $113.6 million (Co. Ex. 59.) Real estate is combined in that Atlas and Polar share common headquarters in Purchase, New York, and share Southern's headquarters in Cincinnati as their combined operational base. Southern's real estate assets have been transferred to Atlas, and many Atlas operations have moved to Southern's Cincinnati location. Employees have been combined – Atlas employs all individuals providing support to Atlas, Polar and Southern, and Southern only employs those individuals it is required to by Part 119 of the FAA regulations. (Tr. 289.)

The Company further states that Union's argument that Polar must also have notified the Union of its intent to merge is not valid. And it maintains that a separate notification is not required by the CBA.

## Discussion and Analysis

While the Union has made a series of compelling arguments for denying the grievance that the Company has brought forth, in the end the Union has not credibly demonstrated that the Company, Atlas, did not make the request to merge the airlines. The facts show that the Company did make it clear that a merger was planned. The company also made it clear after the announcement of the merger that the provisions of the JCBA now prevailed and Section 6 negotiation and any of its requirement were no longer applicable.

While the announcement of the merger was made on January 9th by AAWW, this announcement does not tell the entire story. On February 4th, 2016, Atlas' John Dietrich, Bill Flynn, and Jeff Carlson met with the IBT's leadership, Dave Bourne, Bob Kirchner, Dan Wells, Bryan Holmberg, John Casey, and Nick Manicone in Washington, D.C. At this meeting it was made clear that a merger was going to happen between Atlas and Southern and it was to follow the terms of the CBA. Further, John Dietrich and Jeff Carlson met on behalf of the Company not AAWW. This was followed by a letter dated April 13th, 2016 from Mr. Flynn to Captain Wells on Atlas letterhead, Mr. Flynn wrote: "now that the Southern acquisition is complete, we are proceeding to merge Southern Air, Inc. into Atlas Air, Inc. This includes adhering to the merger provisions found in Section 1 of the respective collective bargaining agreements of Atlas Air, Inc. and Southern Air, Inc. This is consistent with what we have told you since the transaction was announced in January."

Thus, while Captain Carlson stated in his declaration filed with the United States District Court for the Southern District of New York that "AAW[W] has further announced that it intends to merge the operations of Atlas and Southern Air," as it did in its January 19th, 2016 press release, that has no impact on whether the Company itself also decided that there would be a complete operational merger between the Company and an affiliate. The CEOs of Atlas, Polar and Southern, with guidance of AAWW, have

11

the authority to determine whether to merge the carriers from a labor perspective. AAWW's decision to merge the operations of the two carriers did not preclude the Company from also deciding, as it did in the labor context, that there would be a complete operational merger between the Company and Southern.

The other arguments, no matter how compelling, do not alter the fact the Company, Atlas, complied with the provisions of the CBA. Therefore, this Board grants the management grievance in its entirety. The Board orders the Union to comply with the merger provisions of Section 1.F.2 of the CBA, including promptly submitting an ISL, negotiating for a JCBA, and submitting unresolved bargaining issues to binding interest arbitration if a JCBA has not been executed within nine (9) months.

The Award defines "promptly" as 45 days, based on the Chairman's experience in these matters and the particular circumstances of this situation, including the size of the pilot units and the time that has passed since the original announcement, the 45 day period is both timely and sufficient to deliver the ISL to the Company. To conclude Allegheny-Mohawk is not required in this case.

Dated: <u>August 26th, 2019</u>

<u>George Nicolau</u>
George Nicolau, Chairman

**Atlas Air/IBT**

**System Board of Adjustment**

```
-----------------------------------------------------
|                                                   |
|          In the Matter of the Arbitration         |
|                                                   |
|                     Between                        |
|                                                   |          AWARD
|      International Brotherhood of Teamsters        |
|  Airline Division, and Teamsters Local Union No. 1224 |
|                                                   |
|                     - and -                        |
|                                                   |
|                 Atlas Air, Inc.                    |
|                                                   |
|   (Management Grievance alleging Union's violation of |
|           CBA's Section 1.F 2.b (iii)              |
-----------------------------------------------------
```

The Undersigned, acting as the System Board of Adjustment pursuant to the Collective Bargaining Agreement and having duly heard the proofs and allegations of the Parties, therefore render the following.

## AWARD

For the reasons expressed in the foregoing Opinion, the Management grievance is granted in its entirety. The Union has forty-five (45) days to submit to the Company an Integrated Seniority List, at which point the provisions of the CBA section 1.F.2.b (iii) are to be followed.

Dated: August 26th, 2019      _____

                                              George Nicolau, Chairman

_____      _____

            Daniel Katz                        Jennifer Chernichaw

           Union Member                      Company Member

    (I Concur)   (I Dissent)             (I Concur)   (I Dissent)

# DISSENTING OPINION

As I explained during the System Board's executive session and in subsequent correspondence confirming my views, Atlas failed to meet its burden of proving the Union violated the parties' collective bargaining agreement ("CBA"). Moreover, as I further explained, the parties' CBA contains no basis for the Board's Award purporting to impose a 45-day deadline on the Union to present the Company an integrated seniority list ("ISL"). This deadline is impossible for the Union to meet and would -- if valid, which it is not – deprive the Union and those it represents of their rights under federal law.

## 1.  The Company Failed to Establish that the Union Violated the CBA

Even if we assume for the sake of argument that Atlas established that the contractual triggers of Section 1.F.2 were satisfied, the Company failed to carry its burden of proving that the Union did not meet its obligation under subsection b.iii of that provision to "on a timely basis begin negotiations to merge the two pre-integration collective bargaining agreements into one agreement." I submit that the phrase "on a timely basis" cannot and does not mean instantaneously.

The acquisition of Southern Air's holding company by the holding company that owned Atlas closed on April 7, 2016. Atlas wrote to the Union the next day, on April 8, asserting that "the contractual language requiring timely JCBA negotiations unequivocally has been triggered." The Chairman's Opinion recognized that at this point Section 6 negotiations had already begun, with an organizational meeting on December 11, 2015, followed by three days of negotiations in January, three days in February, and three days in March. The parties by then had already reached and signed a number of tentative agreements. When the Union requested the mediatory assistance of the National Mediation Board pursuant to Section 5 of the Railway Labor Act on April 13, the Company filed its present grievance the next day, April 14. The Company erroneously claimed that Section 6 negotiations ended the moment the acquisition closed.

The Chairman incorrectly accepted the Company's contention that the normal manner of revising a CBA automatically terminates merely because the holding company of an airline buys a holding company of another carrier. The statutory mandate for collective bargaining cannot be so easily abandoned. Just because a management official says he plans someday to merge the operations of two commonly owned carriers does not make it so. Nor does it justify jettisoning the right of airline employees to pursue amendments to their CBA through the

1

Section 6 process. If such "pivoting" were truly required, a sizeable airline like this one could forestall Section 6 bargaining indefinitely, as Atlas has here, by repeatedly purchasing a small carrier as the time for bargaining approached or as the bargaining progressed.

Indeed, if the pay rates from the Company's requested interest arbitration turn out ultimately to be unsatisfactory in management's view, what would stop Atlas from changing its mind and dropping its plan to merge Atlas and Southern, even at that late date? After all, Southern is still a separate carrier, with its own fleet of aircraft, FAA operating certificate, DOT certificate of public convenience and necessity, international route rights, airport landing and takeoff slots and other economic authorities. No complete operational merger has occurred. So is Polar a separate carrier, even now, despite the earlier claims of management that led to the interest arbitration process that determined the terms of the current CBA. If Southern and Polar were both spun off, with pilots, only the remaining Atlas pilots would be covered by the CBA that was produced by two interest arbitrations, based on management's later-reversed assertions that mergers were to happen. Inconceivably, they would be working under a CBA that had been twice amended through interest arbitration, on the strength of mergers that never occurred, instead of through the RLA Section 6 process that was already under way.

When Atlas filed its grievance in the case at bar, it demanded that the Union immediately "pivot" from the statutory bargaining process. The closing of the corporate acquisition and the bald assertion of an intention to merge operations were an insufficient basis to say that it was "timely" for the Union blindly to accept the Company's request to abandon its RLA right to Section 6 bargaining.

For, in April 2016, it would have been "timely" to complete the Section 6 process that had already begun, and then to consolidate that amended Atlas CBA with Southern's through the procedure outlined in CBA Section 1.F.2.b.iii. In these circumstances, the Union reasonably took the position that the Company's request to "pivot" was premature, and it did not thereby breach its obligations under the CBA. The management grievance should have been denied.

## 2.  The Award's 45-Day Deadline Is Invalid Because It Deprives the Union and the Pilots of Their Rights under the McCaskill-Bond Amendment

In any event, it was wrong for the Board to say that it is imposing a 45-day deadline for the Union to present the Company an ISL. The impossibility of complying with this deadline improperly places the Union in the untenable position

of eventually being held in contempt of court if Atlas were to succeed in enforcing this aspect of the Award in court. This aspect of the Award also purports to deprive the Union and those it represents of their rights under the McCaskill-Bond Amendment, 49 U.S.C. § 42112, which guarantees them the right to negotiate and arbitrate for a "fair and equitable" ISL, as stipulated in Sections 3 and 13 of the Allegheny-Mohawk labor protective provisions. The Award is thus invalid.

As an initial matter, it is a well-established premise of labor relations arbitration in the United States that the function of an arbitrator is to interpret the parties' CBA, a private contract, and not to attempt to interpret statutory law. The Chairman mistakenly attempted to do so here. As one noted commentator explained, arbitrators have no special claim to expertise in discerning the meaning of statutes, as opposed to labor contracts, and they should therefore respect "the agreement that is the source of their authority" and leave to judicial or other official tribunals "issues that go beyond not only the submission agreement but also arbitral competence." Meltzer, *Ruminations about Ideology, Law, and Labor Arbitration*, in "The Arbitrator, the NLRB, and the Courts, Proceedings of the 20th Annual Meeting of the NAA" 1, 16-17 (Jones ed., BNA Books 1967). *See Sprint/Central Tel. Co.-Nev.*, 114 LA 633, 640 (Baroni, 2000) (arbitrator refused to accept jurisdiction over dispute as to whether contractors were employees of the company because that issue required application of Internal Revenue Service guidelines, which were beyond the "four corners" of the labor contract and therefore beyond the scope of the arbitrator's authority). In the present case, the Chairman acted beyond the scope of the submission by seeking to interpret and apply the McCaskill-Bond statute and the Allegheny-Mohawk labor protection provisions incorporated by reference therein.

McCaskill-Bond provides that in airline consolidations Allegheny-Mohawk Section 3 and 13 "shall apply to the integration of covered employees." The Atlas pilots are without doubt "covered employees."

The law has two exceptions, neither of which applies here. It was through these exceptions that the Chairman misinterpreted the statute and overstepped his authority in determining: "To conclude Allegheny-Mohawk is not required in this case." Opinion at 12.

First, under the Amendment, a "collective bargaining agent's internal policies regarding integration, if any, will not be affected by and will supersede the requirements of this section." The Chairman has apparently accepted the Company Board Member's incorrect assertion in our executive session that the Union has a

merger policy that applies to this transaction. As I noted in the Board's executive session, and as Captain Daniel Wells testified at the hearing, Tr. 670, the International Union's merger policy does not apply because it was adopted after the announcement of the Southern acquisition and operates prospectively only.

This exception to the McCaskill-Bond Amendment for ISL disputes covered by a labor organization's merger policy is accordingly inapplicable, as I explained in my letter to the Chairman confirming the discussions that occurred during the executive session. If the Company had wished to rely on this exception to this statute, it was management's place to offer the merger policy into evidence, not the Union's. The Chairman should have disregarded the Company's unsupported (and erroneous) evidentiary contentions regarding this exception to the McCaskill-Bond Amendment.

Secondly, the Amendment provides that "the requirements of any collective bargaining agreement that may be applicable to the terms of integration involving covered employees of a covered air carrier shall not be affected by the requirements of this section as to the employees covered by that agreement, so long as those provisions allow for the protections afforded by sections 3 and 13 of the Allegheny-Mohawk provisions." Section 1.F.2 of the Atlas CBA may arguably fall within the scope of the first clause of this exception, but a 45-day limit for the ISL process clearly conflicts with the second clause, which guarantees the right to negotiation and arbitration to produce a "fair and equitable" ISL.

The Chairman thus erred in saying that Allegheny-Mohawk was "not required in this case." Under long-standing precepts of labor arbitration, it was not within his purview to opine on the proper interpretation of the McCaskill-Bond statute, and his interpretation was incorrect, in any event.

Moreover, despite the Chairman's assertion concerning his own experience in ISL disputes, the complexities and intricacies of this process are well known to the undersigned. As I have personally observed in dozens of airline pilot and flight attendant ISL cases, in order to permit employees from both pre-merger groups to have confidence that they have received fair treatment in the ISL process, whether or not they like the resulting merged list, labor organizations in the airline industry traditionally adhere to a rigid procedure. Seniority integration representatives from both of the merging carriers are carefully selected. They collect and compile employment data, including dates of hire, dates of birth, periods of furlough or leave, seniority lists, positions held, and the like. These data are verified with the employees themselves, and then certified as correct to the opposing group's

representatives, who, in turn, have an opportunity to check and correct any data related to the other side's population. Negotiations over the employment data follow. Thereafter, negotiations, mediation and potentially arbitration are commonly part of the process for reaching an ISL. One fact is certain: 45 days is insufficient for the completion of this process.

Atlas and the Chairman ignored the realities of airline pilot seniority when they said that it should be a quick and simple matter to integrate the pilot seniority lists of groups totaling only about two thousand when one list includes only two hundred or so pilots. As the Chairman should have recalled from his 1999 decision integrating 162 US Airways Shuttle pilots into the US Airways seniority list comprising 5,311 pilots, which involved years of internecine disputation, these cases can be very complicated. The point is further exemplified by the 1989 decision of Arbitrator Richard I. Bloch integrating the 96 pilots on the Jet America seniority list with approximately five times that number on the Alaska Airlines list, in which years of court litigation and multiple trips to arbitration were needed to settle the ISL issues between the two pilot groups.

The testimony of Captain Wells, cited by the Company's Board Member, supports rather than undermines the foregoing observations. He noted that "even though I am president of the local, I cannot dictate or by fiat say this is the [integrated] seniority list." Tr. 645-46. He was saying, as management clearly understood, that "a way forward" that included "clarity as to what's going to happen in the future," Tr. 667-68, would allow him to encourage the two groups to reach an agreement on combining the lists. Tr. 710. Despite his comments to Company officials in seeking to negotiate a transition agreement in early 2016, management was then and still is fully aware of the obvious reality that producing an integrated seniority list just isn't quick and easy. Captain Wells could not make it so by his comments to the Company and management knew that he was not in a position to waive the statutory rights of his members to negotiate and arbitrate for a "fair and equitable" ISL. The Chairman should have understood that point better than almost anyone, but his decision failed to take that into account.

For these reasons, I respectfully dissent.


/s/ Daniel M. Katz


August 27, 2019                    Daniel M. Katz